# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**NANCY ORTIZ,**

      **Plaintiff,**

-vs-               **Case No.  6:06-cv-239-Orl-KRS**

**COMMISSIONER OF SOCIAL
SECURITY,**

_____

## ORDER

  This cause came on for consideration without oral argument on the Complaint filed by

Nancy Ortiz, seeking review of the final decision of the Commissioner of Social Security denying

her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and

filed a certified copy of the record before the Social Security Administration (SSA).  Doc. Nos. 10,

11.  Pursuant to the consent of the parties, this matter has been referred to me for disposition under

28 U.S.C. § 636(c).  Doc. Nos. 13, 15.

**I.  PROCEDURAL  HISTORY.**

  In May 2002, Ortiz applied for disability benefits under the Federal Old Age, Survivors and

Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.* (sometimes referred to herein as

the Act).  R. 58-60.[1]  The application alleged that Ortiz became disabled on March 30, 2002.  *Id*.

Her application was denied initially and on reconsideration. R. 33-34, 36-37.

Ortiz made a timely request for a hearing before an administrative law judge (ALJ).  R. 32.

An ALJ held a hearing on January 13, 2005.  Ortiz, represented by an attorney, testified at the

hearing.  Randy Salmas, a vocational expert (VE), also testified.  R. 258-75.

After considering the testimony and the medical evidence presented, the ALJ determined

that Ortiz was insured under OASDI through December 31, 2003.  R. 20. The ALJ found that

Ortiz had not engaged in substantial gainful activity since her alleged disability onset date. R. 21.

The ALJ concluded that the medical evidence showed that Ortiz had an adjustment disorder

with depressed mood, plantar fasciitis, a history of transient ischemic attacks (TIAs)[2], and

hypertension, which were severe impairments.  These impairments did not meet or equal any of the

impairments listed in the applicable social security regulations (the Listings).[3]  *Id.*

---

[1]  In her memorandum of law, Ortiz states that she applied for Supplemental Security Income (SSI) benefits.  Doc. No. 20 at 1.  The record does not contain an application for SSI benefits. Furthermore, Ortiz presents argument in her memorandum about her condition as of the date last insured, *id.* at 18, which is a concept relevant only to an OASDI claim, not to an SSI claim. Accordingly, I conclude that Ortiz's reference to an SSI claim was made in error.

[2]  A transient ischemic attack refers to a temporary disturbance of blood supply to an area of the brain that results in a sudden brief decrease in brain function.  It is often called a mini-stroke. Medline Plus, *Transient Ischemic Attack (TIA)*, http://www.nlm.nih.gov/medlineplus/ ency/article/000730.htm (last visited Mar. 7, 2007).

[3]  The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

The ALJ found that Ortiz had the residual functional capacity (RFC) to perform unskilled light work,[4] with the following restrictions: no overhead reaching with the left hand, sitting a maximum of two hours without stretching, standing for one hour, and walking for one hour. *Id.* He also concluded that, due to her depression, Ortiz suffered from moderate restrictions in activities of daily living, mild restrictions in maintaining social functioning, and mild deficiencies in concentration. R. 19. However, he observed that there were no episodes of decompensation or evidence consistent with additional requirements of listing 12.04(c). *Id.*; *see* 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04(c).

In reaching this determination, the ALJ observed that Ortiz testified of constant foot pain and pain in the arm, resulting in difficulty sleeping, problems standing, depression, and fibromyalgia, that she needed crutches and special boots, and that she needed to elevate her feet throughout the day. R. 18. However, the ALJ concluded that while Ortiz had "a medically determinable impairment that could reasonably be expected to produce the pain and other symptoms alleged, the evidence does not support [Ortiz's] allegations of the intensity and persistence of such pain and other symptoms." *Id.* He observed that the evidence indicated that Ortiz was doing well before her date last insured, and that the worsening of her condition occurred after that date. *Id.* He cited a consultative examination prepared in June 2003 that concluded Ortiz could perform light work if she avoided standing for prolonged periods. *Id.* He also reviewed psychological examinations that indicated no evidence of a thought disorder, perceptual

---

[4] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567.

disturbances, delusional process, suicidal ideations, and that her concentration and memory were within normal limits and her insight and judgment appeared good.  *Id.*  The ALJ also observed that Ortiz was able to cook, perform some household tasks, drive when necessary, and attend to her personal hygiene.  *Id.*

Because Ortiz's past relevant work required more than her RFC would allow, the ALJ concluded that Ortiz could not return to her past relevant work.  R. 19.  Relying on the testimony of the VE, and considering the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that, prior to her date last insured, Ortiz could have worked as an unskilled assembly worker, a position that exists in significant numbers in the national and local economy.  R. 20.

Ortiz requested review of the ALJ's decision. R. 9.  She also submitted treatment notes from Dr. Jose R. Fernandez prepared during 2004.  R. 8; *see* R. 254-57.  On November 28, 2005, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 5-7. Ortiz then sought review of this decision by this Court.[5]  Doc. No. 1.

## II.    JURISDICTION.

---

[5]  The complaint in this action was filed on February 24, 2006, which is more than sixty-five days from the date of the Appeals Council decision.  Pursuant to 42 U.S.C. § 405(g), a civil action challenging a decision by the Commissioner must be filed within sixty days of receipt of the notice of decision.  The Commissioner assumes five days for mailing. 20 C.F.R. § 422.210(c).  A party may also request leave to file a complaint after the sixty days.  *Id.*  It does not appear that Ortiz did so. Nevertheless, the filing deadline is a statute of limitations, which may be waived. *See Bowen v. City of New York*, 476 U.S. 467, 479 (1986).  Because the Commissioner has not objected to the timeliness of this complaint, I conclude that any timeliness issues have been waived.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Ortiz's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. § 404.981.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

III.   **STATEMENT OF FACTS.**

    A.   *Evidence from Ortiz.*

Ortiz was born March 28, 1957.  R. 262.  She is 5'2" tall and weighed approximately 180 pounds at the time of the hearing.  *Id.*  She completed high school.  *Id.*  Ortiz had previously worked as a housekeeper and as a daycare provider.  R. 64, 84, 262-63.  Ortiz only spoke Spanish, and was assisted throughout the hearing by an interpreter.  R. 260.

Ortiz began experiencing pain and swelling associated with heel spurs in 2002.  R. 63.  She also described burning pain in her feet.  R. 268, 270.  She rated her pain as six to ten on a ten-point scale depending on how long she had walked or what activities she had done.  R. 80.  She had also woken from sleep because of pain.  R. 81, 98.  She had been given cortisone injections on several occasions.  R. 65, 81.  She also took Robaxin, a muscle relaxant, two or three times per week.  R. 266.  When her feet swelled, she needed to elevate them.  R. 267.  Her doctor had advised her against working on her feet.  R. 65.

She also experienced pain lifting, especially in the left shoulder, and the pain sometimes radiated to her arms and hands.  R. 265.  She attributed the pain in her arm to a mini-stroke.  R. 270.

Ortiz also suffered from depression.  *Id.*  She was attending counseling.  R. 269-70.  She intended to see a psychiatrist when authorized to do so by her insurer.  R. 267.

Ortiz lived with her husband and daughter.  R. 264.  In a typical day, she had to sit down after waking because of foot pain.  *Id.*  She picked up the house, and would then spend the rest of the day sitting, reading, and watching television.  *Id.*  If she sat for more than one and one-half to

two hours, she began experiencing pain in her hips because of fibromyalgia.[6]  *Id.*  She experienced

pain when standing for more than about twenty-five minutes, and she could not stand for more than

about two hours.  R. 265.  Even using orthopedic boots and a crutch, she could not walk for  more

than about one hour.  R. 265, 268-69.

Ortiz had a driver's license and could drive.  R. 265-66.  She could go grocery shopping,

although her husband often performed this task, and she often required help carrying bags.  R. 76,

266.  Her daughter did laundry.  R. 266.  She could prepare simple meals that did not require her to

be on her feet long.  *Id.*  She attended church several times a week, but she was unable to help out

as much as before she began having problems with her feet.  R. 77, 265.

Ortiz did not take medication for depression, but attended counseling.  R. 267, 270.  A

psychiatrist had indicated that medication may be necessary.  R. 267.

B.     *Medical Records.*

1.     Physical Impairments.

Ortiz began treatment at the Orlando Foot and Ankle Clinic in April 2002.  She complained

of tenderness and pain in both feet.  She reported that she had previously had foot surgery, but she

did not heal well.  R. 123.  Upon examination, Luis J. Sanchez-Robles, D.P.M., noted that Ortiz

had diffuse tenderness and pain in her feet, ankles and legs.  X-rays revealed arthritic joint changes

or abnormalities in the joints or bones of the feet.  *Id.*  Dr. Sanchez-Robles observed that Ortiz

---

[6] "Fibromyalgia is a common condition characterized by long-term, body-wide pain and tender points in joints, muscles, tendons, and other soft tissues.  Fibromyalgia has also been linked to fatigue, morning stiffness, sleep problems, headaches, numbness in hands and feet, depression, and anxiety." The cause of fibromyalgia is unknown. Medline Plus, *Fibromyalgia*, http://www.nlm.nih.gov/medlineplus/ency/article/000427.htm (last visited Mar. 7, 2007).

"ha[d] been diagnosed with enthesopathy [7]and capsulitis,[8] migratory pain, tendonitis,[9] [and] tenosynovitis[10] of multiple tendons on the foot.  It is possible arthritic in origin and systemic arthritis disease." R. 124.  He treated Ortiz with medication and recommended that she avoid excessive walking, elevate her feet at home, and use heat and cold therapy as directed. *Id.*

At a follow-up visit later in April, Dr. Sanchez-Robles observed that Ortiz had plantar fasciitis,[11] heel pain, and bursitis.[12]  R. 122. He treated Ortiz with taping, strapping and padding, apparently of the left foot, which Ortiz was to remove in three days.  He recommended that Ortiz avoid walking and continue the use of pain medication and heat and cold therapy.  R. 122.

During a follow-up examination in May, Dr. Sanchez-Robles did not observe any improvement.  However, Ortiz reported that she felt better when she did not engage in weightbearing activities.  Dr. Sanchez-Robles continued to treat her with medication and recommendation that she avoid excessive walking.  R. 121.

---

[7]  Enthesopathy refers to "[a] disease process occurring at the site of insertion of muscle tendons and ligaments into bones or joint capsules." STEDMAN'S MEDICAL DICTIONARY 578 (26th ed. 1995) (hereinafter STEDMAN'S).

[8]  Capsulitis refers to the inflammation of the capsule, a fibrous tissue layer. STEDMAN'S at 272-73.

[9]  Tendonitis refers to inflammation of a tendon. STEDMAN'S at 1769.

[10]  Tenosynovitis refers to the inflammation of a tendon and its enveloping sheath. STEDMAN'S at 1771.

[11]  Plantar fasciitis refers to an inflammation or swelling of fibrous tissue on the sole of the foot. STEDMAN'S at 628, 638, 1375.

[12]  Bursitis refers to the inflammation of a bursa, or closed sac or envelope covering an area exposed to friction, such as where a tendon passes over a bone. STEDMAN'S at 252, 254.

Ortiz reported in July that medication helped to relieve her pain. R. 120. However, in October 2002, Dr. Sanchez-Robles observed a worsening of plantar fasciitis and other heel pain. R. 118. He recommended surgery of the plantar fascia. *Id.*; *see also* R. 233 (preoperative clearance report). In November 2002, Ortiz underwent a plantar fasciotomy. R. 116. Dr. Sanchez-Robles observed good post-surgical recovery, and in December 2002, observed that she was "doing excellent." R. 113-15. In January 2003, Dr. Sanchez-Robles observed that she was "doing fairly well" but still had problems with pain. R. 112. He recommended ice and elevation of the foot. R. 112. In February 2003, he observed that Ortiz walked on her feet but had some pain. R. 111. He advised an injection and continued use of ibuprofen. *Id.*

In April 2003, Ortiz was admitted to the hospital after seeking emergency room treatment for tingling and numbness of the left upper and lower extremities and shortness of breath. R. 170-71. After examining Ortiz, Saif Ullah, M.D., recorded the impression that Ortiz had had a TIA. R. 168. She was released but subsequently readmitted due to complaints of headaches. R. 185.

Amaryllis Sanchez, M.D., examined Ortiz to follow-up on this hospital stay. R. 185-86, 229. At that time, Ortiz complained of continued weakness in her left arm with parathesias, although this condition was improving. She also continued to have headaches. Upon examination, Dr. Sanchez noted mild aortic and mitral regurgitation.[13] She was treated with medication and continued physical therapy. R. 185, 229. During an examination in May 2003, Ortiz reported that

---

[13] Mitral regurgitation "is a disorder in which the heart's mitral valve suddenly does not close properly, causing blood to leak (back-flow) into the left atrium (upper heart chamber) when the left ventricle (lower heart chamber) contracts." Its symptoms include rapid breathing, shortness of breath, palpitations, chest pain, and cough. Medline Plus, *Mitral regurgitation – acute*, http://www.nlm.nih.gov/medlineplus/ency/article/000177.htm (last visited Mar. 7, 2007).

her headaches were much better and the parathesias were almost completely gone.  R. 228.  In July

2003, Dr. Sanchez noted that Ortiz had not had headaches since her blood pressure had been better

controlled.  R. 227.  As of December 2003, Ortiz reported that she only had occasional headaches,

which were relieved by use of Elavil.  R. 225.

　　　　In June 2003, Alex Perdomo, M.D., performed a consultative examination at the request of

SSA.  R. 125-26.  Ortiz complained of constant foot pain, with and without weight bearing.  She

also complained of intermittent left shoulder pain.  R. 125.   X-rays of the feet showed changes

consistent with osteoarthritis.  Upon examination, Dr. Perdomo observed tenderness in both heels

and throughout joints in the foot.  Ortiz had full range of motion in her upper and lower

extremities.  Dr. Perdomo's impression was that Ortiz suffered from bilateral foot pain and plantar

fasciitis.  R. 126.  He opined that Ortiz would benefit from weight loss and physical therapy.  He

opined that Ortiz "could perform well in light duty work avoiding standing for more than four

hours a day, stair climbing, or prolonged walking."  *Id*.

　　　　In November 2003, Roberto E. Pancorbo, M.D., examined Ortiz regarding generalized joint

pain in both feet, left shoulder, arms, hands, and knees.  R. 200-01.  Ortiz reported some episodes

of swelling of both hands, but did not have significant morning pain or sleep-related problems due

to joint pain.  R. 200.  On examination, her left wrist was tender, and there was decreased range of

motion in the left shoulder.  R. 201.  There was also some pain at certain fibromyalgia trigger

points in the upper back and neck.  *Id*.  Dr. Pancorbo's impression was polyarthritis of the hands

and feet, periarthritis of the shoulder, myofascial pains, and possible osteoporosis.  *Id*.  He started

Ortiz on Robaxin and advised an exercise regimen.  *Id*.

In February 2004, Dr. Sanchez-Robles observed that Ortiz's plantar fasciitis had worsened, and he recommended surgery.  R. 217.  The surgery was conducted in April 2004.  R. 215.  There were no complications observed at the time.  R. 215.

An X-ray read in March 2004, showed normal shoulders and wrists, and mild degenerative process in the hands.  The radiologist's impression was mild degenerative joint disease.  R. 199.

In May 2004, Dr. Pancorbo saw Ortiz for follow-up on her arthritis.  R. 195.  She reported increased pain in the hip, shoulders, and left arm.  *Id.*; *see also* R. 220.  The impression was polyarthritis of the hands and feet, and fibromyalgia syndrome.  R. 195.  Dr. Pancorbo continued to treat Ortiz with medication.  *Id.*  In a follow-up visit in July, Ortiz continued to complain of pain, which was confirmed upon examination.  The examiner noted that Ortiz walked upright without difficulty and without an assistive device, and that she had good range of motion in all joints.  R. 193.

In July 2004, Dr. Sanchez-Robles saw Ortiz for follow-up on the surgery.  Ortiz experienced some tenderness, but no soft tissue swelling.  R. 213.

It also appears that Ortiz was treated by Karamali A. Bandealy, M.D.  The records from Dr. Bandealy are scant.  On July 16, 2004, he read x-ray reports that showed osteopenia[14] of the foot joints and small bone spurs.  R. 194.  The X-ray of the ankles was normal.  *Id.*; *see also* R. 209 (same).

---

[14]  Osteopenia refers to decreased calcification or density of a bone.  STEDMAN'S at 1270.

Also in July 2004, Patrick F. Mathias, M.D., examined Ortiz for complaints of pinching in her chest, shortness of breath, and palpitations. The impression was mitral regurgitation, hypertension, history of a cerebrovascular accident, and history of migraines. R. 219.

In August 2004, Dr. Sanchez-Robles examined Ortiz. He observed that she had recurrence of tenderness of the feet, plantar fasciitis, and pain that occasionally resulted in difficulty sleeping. R. 212. She was given an injection and a prescription for Vioxx. *Id*. In October 2004, Dr. Sanchez-Robles observed that Ortiz had worsened tendinitis or tendinosis[15] after a fall at home. R. 211.

In November 2004, Dr. Pancorbo examined Ortiz for follow up regarding arthritis and fibromyalgia. R. 188; *see also* R. 256. Ortiz reported doing well, but indicated that she experienced left elbow pain that was sometimes shooting and other times deep muscular. R. 188. Dr. Pancorbo's impression was epicondylitis[16] of the left elbow, fibromyalgia, polyarthritis, and degenerative joint disease of the feet. *Id*.

In December 2004, Dr. Sanchez-Robles observed that Ortiz was only briefly helped by injections to the foot, and that she was unable to walk for more than an hour or two without feeling pain. R. 208. He observed a limping gait. *Id*. He observed that she responded well to a fracture boot, and recommended that she use boots, crutches, and a wheelchair on occasion. *Id*. He

---

[15] Tendinosis refers to degeneration of the tendon. WebMD, *Tendon Injury (Tendinopathy)*, http://www.webmd.com/hw/muscle_problems/uh2117.asp (last visited Mar. 7, 2007).

[16] Epicondylitis refers to an inflammation, soreness, or pain near the elbow, and is often caused by repeated twisting of the wrist or forearm. It is often called "tennis elbow." Medline Plus, *Tennis elbow*, http://www.nlm.nih.gov/medlineplus/ency/article/000449.htm (last visited Mar. 7, 2007).

observed that her capsulitis had worsened and that she had developed peroneal tendinosis.[17]  He administered an injection and recommended use of ice and heat, and an ace bandage.  R. 210.

In December 2004, Dr. Sanchez-Robles prepared a Physical Capacities Evaluation Medical Assessment.  R. 205-07.  He opined that Ortiz could sit for eight hours and could stand or walk for less than one hour in an eight-hour workday.  R. 205.  She would need Canadian (forearm) crutches.  *Id*.  Dr. Sanchez-Robles further opined that Ortiz could never lift even five pounds.  *Id*. She could not use her feet for pushing or pulling leg controls.  R. 206.  Ortiz would need "complete freedom to rest frequently without restriction," and Dr. Sanchez-Robles recommended a sitting position, although she would not be required to elevate her feet.  *Id*.  Dr. Sanchez-Robles also indicated that it would be necessary for Ortiz to change positions frequently and to lie down or sit in a recliner for a substantial period of time during the day.  R. 207.  The diagnosis was fibromyalgia and severe foot pain, and the prognosis was permanent.  R. 206-07.

2.      Mental Impairments.

In April 2003, Ortiz was seen at the Dr. Phillips Psychiatric Group, P.A. by Doris Omdahl, LMHC (licensed mental health counselor).  R. 140-44; *see also* R. 248-52.  Ortiz complained of low self esteem, depression after her stroke/TIA, and fears of being along, driving alone, or leaving the house alone.  R. 140.   Her mood was depressed, with crying, and her affect was sad.  R. 142-43. Her insight and judgment were fair.  R. 143.  The mental diagnoses were major depressive disorder and dependent personality disorder, and the prognosis was guarded.  R. 143.  Her global

---

[17]  Peroneal refers to the fibula (calf bone), the lateral side of the leg, or the muscles attached thereto. STEDMAN'S at 1334.

assessment of functioning (GAF) was 45.[18]  R. 143.  Ortiz met with Omdahl through at least June

2004.  R. 138-39, 243-45.  Although Omdahl's handwritten notes are difficult to read, it appears

that Ortiz expressed improvement in her condition in July 2003.  R. 139.

In August 2003, Ada Ramirez, Ph.D., conducted a psychological evaluation at the request

of SSA.  R. 135-37.  Ortiz reported that she started to feel depressed about one year earlier due to

continuing medical problems, coupled with disturbed sleep patterns.  She indicated that she was

able to care for her basic hygiene, and could cook as long as she could sit down often.  She was

able to drive when necessary, but members of her family usually drove her to appointments.  She

had no social life.  R. 136.

Upon examination, Dr. Ramirez noted that Ortiz became tearful talking about the effects of

her health problems on her family.   She had a depressed mood and her affect was restricted.  Her

concentration and attention were within normal limits, and her memory was normal.  R 136.  Dr.

Ramirez's diagnosis was Adjustment Disorder with Depressed Mood, Chronic.  R. 137.  She

recommended evaluation of Ortiz's antidepressant prescription, because Ortiz had stopped taking a

prescribed medication because of side-effects.  *Id*.

---

[18]  The GAF scale is used to report an individual's overall level of functioning. A GAF
rating between 41 and 50 reflects:

Serious symptoms (eg, suicidal ideation, severe obsessional rituals, frequent shoplifting)
OR any serious impairment in social, occupational, or school functioning (eg, no
friends, unable to keep a job).

HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed.
1998) (hereinafter SYNOPSIS OF PSYCHIATRY).

In December 2004, Noel Figueroa, M.D., performed a psychiatric evaluation.  R. 236-39. Ortiz complained of depression, difficulty concentrating, and forgetfulness.  R. 236.  She also suffered from migraine headaches.  *Id.*  Dr. Figueroa observed that Ortiz's mood was depressed, but her insight and judgment were intact and she performed well on cognitive testing.  R. 238.  Dr. Figueroa concluded that Ortiz had a major depressive disorder, single episode, of moderate intensity, for which medication and counseling were recommended.  *Id.* The level of psychosocial stressors was severe, and her GAF was 49.  R. 239.  Dr. Figueroa opined, "Maybe in her case her psychiatric status is not enough to say that she is unable to engage in substantial gainful activity, but putting together her physical deficits and adding her psychiatric condition I doubt that the patient can be able to work." *Id.*

Dr. Figueroa also completed a mental residual functional capacity assessment.  R. 240-42. Dr. Figueroa indicated that Ortiz would experience moderate limitations in the ability to do the following: remember locations and work-like procedures; understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and be aware of normal hazards and take appropriate precautions.  R.  240-41.

*C.    Reviewing Professionals.*

In January 2003, Gloria B. Hankins, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 103-10.  Dr. Hankins indicated that Ortiz could occasionally lift up to fifty pounds, frequently lift up to twenty-five pounds, sit, stand or walk about six hours in an eight-hour workday, and that she would have no limitations on her ability to push and pull.  R. 104.  She indicated that Ortiz would experience occasional limitations on ability to climb or balance due to foot pain, but that she could frequently stoop, kneel, crouch, and crawl.  R. 105.  She indicated no manipulative, visual, communicative, or environmental limitations.  R. 106-07.

In July 2003, David Z. Kitay, M.D., completed a Physical Residual Functional Capacity Assessment.  R. 127-34.  He indicated that Ortiz could occasionally lift up to twenty pounds and frequently lift up to ten pounds, that she could stand, walk or sit for about six hours in an eight-hour workday.  R. 128.  He indicated that she would have occasional limitations on ability to climb.  R. 129.  He observed no manipulative, visual, communicative, or environmental limitations.  R. 130-31.

In September 2003, David R. Cox, Ph.D., completed a psychiatric review technique form based on a review of Ortiz's records.  R. 145-58.  He opined that Ortiz did not have a severe mental impairment.  R. 145.  He indicated that Ortiz would experience mild limitations in activities of daily living, maintaining social functioning, maintaining concentration, persistence, and pace, and that she had no episodes of decompensation.  R. 155.

D.      *Vocational Expert Testimony.*

The ALJ posed the following hypothetical question to the VE:

> Assume . . . a person who was between the ages of 45 and 47, with a
> high school education.  And assume that they had limited light and
> full sedentary residual functional capacity.  Assume they had the
> following restrictions.  Assume that the person's job would be one
> that would not require them to use their left hand to reach overhead.
> Assume that they could sit for a maximum of two hours at one time
> without having to get up and stretch, but not for the whole day.  Just
> at a time.  The job might require them to sit an hour, hour and a half,
> but never more than two hours at a time.  Assume they could stand
> for an hour and walk for an hour at a time without having to sit.
> Could that person do the previous light work as a housekeeper?

R. 271-72.  Based on this hypothetical question, the VE opined that the hypothetical claimant could

not perform the housekeeper position.  R. 272.  The ALJ then asked whether there were other jobs

in the national economy that the hypothetical claimant could perform "that would allow for those

sit/stand options and restrictions."  *Id*.  The VE opined that there would be unskilled assembly

positions that such a claimant could perform.  *Id*.  There were a substantial number of such

positions in the local and national economies both at the light and sedentary levels of exertion.  *Id*.

The ALJ added a question regarding emotional problems resulting in a slight impairment on

ability to understand, remember and carry out simple instruction, and make work related decisions;

a slight impairment interacting with supervisors, co-workers and the public, and responding to

routine work settings; and a moderate impairment in carrying out detailed instruction, and in

dealing with work pressures.  R. 273-74.  The ALJ defined moderate as "limited but could

generally function well."  R. 274.  The VE opined that these limitations would have a negative

impact on the jobs identified.  *Id*.

Ortiz's attorney added the following limitations:

> Can sit for eight hours. Stand only for one hour.  But needs crutches and boots to walk.  Is unable to lift any pounds . . . . No lifting.  Can't use the feet – both feet – to operate controls.  Needs complete freedom to rest frequently due to pain. . . . Needs to lay down or sit in recliner for a substantial period of time during the day, to relieve pain in feet and swelling.

R. 273.  The VE opined that such a claimant could not do any sedentary work.  *Id*.

## IV.     STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  In a case under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

>(4) Is the claimant unable to perform his or her former occupation?
>
>(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

-19-

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## V.    ANALYSIS.

Ortiz asserts four grounds supporting reversal.  She contends that the ALJ erred by failing to adopt the RFC assessment rendered by Dr. Sanchez-Robles, a treating physician, and that the hypothetical question posed to the VE was deficient because it did not include the limitations indicated by Dr. Sanchez-Robles.  She argues that the VE's opinion was also insufficient because the VE did not identify specific jobs that she could perform, referring only generally to unskilled

-20-

assembly positions.  Finally, she contends that the ALJ erred in addressing the limitations arising

from pain and other subjective symptoms and did not state adequate reasons for finding her

testimony regarding these limitations to be not fully credible.  These are the only issues I will

address.[19]

A.       Determination of Ortiz's Residual Functional Capacity.

"The residual functional capacity is an assessment, based upon all of the relevant evidence,

of a claimant's remaining ability to do work despite his impairments."  *Lewis v. Callahan*, 125 F.3d

1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1545(a)).  The determination of RFC must

include all medically determinable impairments, including those that are not severe.  20 C.F.R. §

404.1545(b).

In evaluating RFC, the opinion of a treating physician must be "must be given substantial or

considerable weight unless 'good cause' is shown to the contrary."  *Lewis*, 125 F.3d at 1440 (citing

20 C.F.R. § 404.1527(d)(2)).  Good cause has been found "where the doctor[s'] opinion[s] [were]

not bolstered by the evidence, . . . where the evidence supported a contrary finding[,] . . . [or]

where the doctors' opinions were conclusory or inconsistent with their own medical records."  *Id.*

(internal citations omitted).  The ALJ must articulate the reasons for giving less weight to the

opinion of the treating physician.  *Id.*

Dr. Sanchez-Robles, one of Ortiz's treating physicians, opined in December 2004, that

Ortiz could not lift, could stand or walk less than one hour a day using Canadian crutches, must

have complete freedom to rest without restriction, and should work from a sitting position.  The

---

[19]  The parties were advised that issues not specifically raised would be waived.  Doc. No. 14.
at 2.

ALJ acknowledged this opinion, R. 18, but did not adopt it, finding that Ortiz was doing well prior to December 31, 2003, the date she was last insured under OASDI.

Substantial evidence supports the ALJ's conclusion that Dr. Sanchez-Robles's opinion of Ortiz's physical functional capacity as of December 2004, did not accurately reflect her functional capacity as of the date she was last insured, which was one year before Dr. Sanchez-Robles rendered his RFC opinion. In February 2003, after plantar fasciotomy surgery, Dr. Sanchez-Robles's notes reflect that Ortiz could walk, albeit with some pain. In June 2003, Dr. Perdomo noted that Ortiz complained of constant foot pain, but found that she had full range of motion and could perform light duty work avoiding standing more than four hours a day, stair climbing and prolonged walking. Dr. Pancorbo's notes of treatment of Ortiz in November 2003 reflect complaints of pain but contain no indication that Ortiz was having difficulty walking or standing. Ortiz reported to Dr. Sanchez in December 2003 that she only had occasional headaches.

With respect to her mental impairments, Ortiz indicated to Omdahl in July 2003 that her condition was improved. After examining Ortiz in August 2003, Dr. Ramirez did not opine that Ortiz had any functional limitations arising from her mental impairment.

The evidence further supports the ALJ's conclusion that Ortiz's condition deteriorated after her last insured date. As of February 2004, her plantar fasciitis had worsened, and she had another surgery. As of May 2004, however, records reflect that she walked upright without difficulty and without an assistive device. It was not until December 2004, that medical records reflect that Ortiz could not walk without a limp, and required use of boots, crutches and a wheelchair on occasion. While Dr. Sanchez-Robles noted some pain at certain trigger fibromyalgia trigger points in

-22-

November 2003, the first diagnosis of fibromyalgia does not appear until May 2004. As for her mental impairments, in December 2004, Dr. Figueroa found that her psychological impairments were not sufficient to preclude her from working, but that her combined physical and mental impairments made it doubtful that Ortiz would be able to work.

The ALJ articulated specific reasons for rejecting the December 2004 RFC assessment by Dr. Sanchez-Robles, one of Ortiz's treating physicians. His reasons are supported by substantial evidence in the record. Accordingly, Ortiz's argument that the ALJ erred in determining her RFC is unavailing.

      B.      *Reliance on the VE's Testimony.*

"The ALJ [is] not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004). Accordingly, because substantial evidence supports the ALJ's RFC assessment, he was not required to include the limitations stated by Dr. Sanchez-Robles in his hypothetical question to the VE.

Ortiz also contends that the ALJ erred in relying on the VE's opinion that Ortiz could perform unskilled assembly positions because the VE failed to identify those position specifically by references to the *Dictionary of Occupational Titles.* Ortiz cites no authority in support of her position. In this circuit, when the testimony of a VE and the description of a job in the DOT conflict, the testimony of the VE controls. *Jones v. Apfel*, 190 F.3d 1224, 1229-30 (11th Cir. 1999). "Unless the VE is proven incorrect, the ALJ may rely on the VE's testimony." *Zimmer v. Comm'r of Soc. Sec.*, No. 06-12386, 2006 WL 3090142, at * 2 (11th Cir., Nov. 1, 2006)(citing

*Jones*, 190 F.3d at 1230).  Ortiz has not cited any evidence or any legal authority that shows that the VE's opinion about the type of work Ortiz could perform, or the number of jobs available, was incorrect.

Accordingly, Ortiz's contention that reliance on the VE's opinion was erroneous is unavailing.

     C.    *Application of the Pain Standard and Assessment of Ortiz's Credibility.*

Ortiz also contends that because she had underlying medical conditions that reasonably could result in pain and the other subjective symptoms about which she complained, the ALJ erred in finding that she did not have all of the functional limitations about which she testified.

"[I]n certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) (citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992)).  To evaluate allegations of pain, the ALJ must apply the pain standard, which "'requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" *Foote*, 67 F.3d at 1560 (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.1991)).  If proof of a disability is based upon subjective evidence and a credibility determination is critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote*, 67 F.3d at 1562.

-24-

The ALJ's decision reflects that he understood and applied the pain standard.  *See* R. 18. As discussed in more detail above with respect to assessment of Ortiz's RFC, the ALJ articulated specific reasons, supported by the evidence, to conclude that Ortiz's limitations arising from pain and other subjective symptoms as of the date of her testimony at the hearing conducted in January 2005, overrstated the extent of her limitations as of December 31, 2003, the date she was last insured under OASDI.  As such, the ALJ complied with the law in this circuit regarding assessment of pain and other subjective symptoms and weighing Ortiz's credibility, and substantial evidence supports his conclusion.  Accordingly, these assignments of error are also unavailing.

**VI.      CONCLUSION.**

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **AFFIRMED**.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 7, 2007.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

-25-